FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 JUL 28 PM 1:46

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NATIONAL CANADA FINANCE, LLC, | ] |
| Plaintiff(s), | ] |
| vs. | ] |
| JWF INDUSTRIES, INC., et al., | ] |
| | ]  CV-02-CO-1000-S |
| Defendant(s) and Third-Party Plaintiff(s), | ] |
| vs. | ] |
| LARRY C. LAVENDER, | ] |
| Third-Party Defendant(s). | ] |

ENTERED

JUL 28 2003

MEMORANDUM OF OPINION

I.    INTRODUCTION.

Presently before the court are motions for summary judgment, filed by the plaintiff and by the third-party defendant, on April 16, 2003, and May 5, 2003, respectively. [Doc. ## 30, 40.] Also before the court is a motion to strike portions of the affidavit of Daphne Trammell, filed by the third-party defendant on May 20, 2003. [Doc. # 48.] The issues raised in the motions have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, and for the reasons that follow, the court is of the opinion that the plaintiff's motion for summary judgment is due to be granted, the third-party defendant's motion for summary judgment



is due to be granted, and the third-party defendant's motion to strike is due to be denied.

II.   FACTS.[1]

A.   Guy Mitchell's ownership of QMW.

Defendant John W. Fleming ("Mr. Fleming") owned a metal fabricating company named Quality Machine & Fab Works, Inc. ("Quality"), from 1981 through 1997. Mr. Fleming and his wife owned the real estate on which Quality operated, and they leased the property to Quality. In 1997, for a sum of $6,000,000.00 plus a consulting contract whereby Mr. Fleming would be paid annual consulting fees, Mr. Fleming sold the business to QMW, a company formed by Guy Mitchell ("Mr. Mitchell"). When Mr. Fleming sold Quality to Mr. Mitchell, annual sales for the last year of Mr. Fleming's ownership totaled $14,000,000.00; for the two years prior, sales totaled between $9,000,000.00 and $10,000,000.00 per year.

At Mr. Mitchell's option, Mr. Fleming and his wife continued to lease to QMW the real property on which Quality had been located. Mr. Mitchell financed his purchase of Quality through

---

[1]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

plaintiff National Canada Finance, L.L.C. ("NCF"), which was granted a security interest in all of QMW's assets.

After Mr. Mitchell assumed ownership of QMW, the business began losing customers, money, and employees. However, NCF made allowances for QMW's losses, deferring QMW's payments on its loan with NCF despite QMW's defaults on the loan. Mr. Fleming also made allowances for Mr. Mitchell and QMW. Approximately one year after purchasing QMW, Mr. Mitchell contacted Mr. Fleming to inform him that QMW could not make any payments to Mr. Fleming, including payments on the note for the purchase of QMW, rental payments for the real property on which QMW was located, and the deferred purchase price consulting fees to Mr. Fleming. Mr. Fleming therefore negotiated a lower cash purchase price with Mr. Mitchell; he hoped this would enable Mr. Mitchell to keep QMW operating and thus allow Mr. Fleming to avoid an actual loss on his sale of Quality.

QMW's business continued to decline, however, and QMW was unable to cover its payments to NCF and Mr. Fleming. In an attempt to protect himself from further losses, Mr. Fleming offered to repurchase the business from Mr. Mitchell in 2000. In connection therewith, Mr. Fleming approached NCF and requested that it discount its debt, which NCF declined to do, so the deal fell through.

Instead, NCF and Mr. Mitchell finalized a deal for the transfer of Mr. Mitchell's interest in QMW to third-party defendant Larry Lavender ("Mr. Lavender"), who had been working with Mr. Mitchell at QMW. Mr. Lavender purchased the stock in QMW for $10.00, an amount he never paid, and he guaranteed payment of $300,000.00 of QMW's debts to NCF. Mr. Lavender assumed the presidency of QMW in May 2000, and assumed ownership of the company in December 2000.

B.   Larry Lavender's ownership of QMW.

Before his takeover of QMW, Mr. Lavender started a steel erection business, which was added to QMW after he started with the company. Prior to Mr. Lavender's involvement, QMW had never performed any steel erection work. Under Mr. Lavender's ownership, QMW continued to use the consulting services of Mr. Fleming, and Mr. Fleming continued to lease the real property on which QMW was situated to the company. NCF did not allow QMW to pay Mr. Fleming any rental or consulting fees while Mr. Lavender ran the company. The company continued to experience losses in 2001, and in July of that year, Mr. Lavender met with Ed Simpson ("Mr. Simpson") of NCF to discuss the future of QMW.

Mr. Lavender eventually decided to cease operations and liquidate, and NCF, as a secured creditor, began to foreclose upon its collateral by collecting the accounts receivable and arranging for a public auction of the equipment, goods, and inventory. Mr.

Lavender and QMW employees assisted with the collection of accounts and the liquidation of assets, and NCF and Mr. Lavender discussed the status of ongoing jobs (also referred to as work in process, or "WIP") to determine if NCF should loan funds to QMW to complete the WIP prior to an auction.

      C.   The foreclosure of QMW and Mr. Fleming's purchase of the assets thereof.

In August and September 2001, it became known that NCF planned to cease operations in the United States because it had a high number of bad loans, including the QMW loan. At this time, NCF approached Mr. Fleming to see if he was interested in repurchasing the assets of QMW. NCF informed Mr. Fleming that it planned to auction QMW on November 1, 2001, and that time was of the essence. Further, Mr. Simpson indicated that if Mr. Fleming wanted to make an offer for the purchase of QMW, he should "get it in front of Larry [Lavender] so we can think about it." (Simpson Dep. 40-41.)

Mr. Fleming's business broker, Roger Graul ("Mr. Graul") worked on behalf of Mr. Fleming to effectuate the sale. Mr. Fleming formed defendant JWF Industries, Inc. ("JWF") in order to purchase the assets of QMW. Mr. Fleming decided to purchase the assets of QMW because he felt it was the only way to protect himself from a total loss on his business interest in QMW as a landlord and a consultant.

On October 1, 2001, Mr. Fleming submitted a letter of intent to purchase the fixed assets of QMW for a set purchase price. Among

the assets Mr. Fleming intended to purchase were the steel erection assets; he chose to purchase these, despite the fact that he was unfamiliar with the steel erection business, based on Mr. Lavender's representation that the steel erection business was "the only thing keeping the company afloat." (Graul Dep. 101.) The letter of intent expressly excluded from the assets Mr. Fleming was interested in purchasing any WIP as of October 1, 2001. However, Mr. Fleming did agree to continue to work the WIP through to completion for NCF, with NCF paying the suppliers for the WIP. Mr. Fleming testified that Mr. Simpson agreed that NCF would pay the suppliers that furnished materials for the WIP. Mr. Fleming and JWF would receive a ratio of the profits from all work they completed on the WIP.

Upon issuing his letter of intent, Mr. Fleming began due diligence with respect to his purchase of the QMW fixed assets on October 3, 2001. Mr. Fleming did not, however, perform any due diligence on the WIP, because at that time, he had no intent to purchase the WIP.

NCF foreclosed on QMW on October 9, 2001, making NCF the sole owner of QMW. In the process of foreclosing on QMW, NCF conditionally released Mr. Lavender from his $300,000.00 personal guarantee, contingent upon Mr. Lavender assisting NCF "with the liquidation of the work in process." (Lavender Dep. 88.) Mr. Fleming took over management of the fixed assets on October 17,

2001. He secured a personal loan of $200,000.00 from First Commercial Bank ("First Commercial"), which he personally guaranteed, to begin to operate QMW. According to Mr. Fleming, Mr. Lavender had instructed him to pay WIP suppliers until such time as NCF could reimburse him for those costs. At the time Mr. Fleming began business operations, no documents for the purchase of the fixed assets had been signed.

D.    The dispute as to who would pay suppliers on the WIP.

According to Mr. Fleming, after he had agreed to run the WIP for NCF and had invested money in and started operation of JWF, NCF and Mr. Lavender disclosed to him that NCF would not pay QMW's suppliers for any work performed on the WIP. NCF did, however, intend to collect amounts due to QMW on the WIP. Mr. Fleming informed NCF and Mr. Lavender that he would not work the WIP for NCF if it did not intend to pay the suppliers. Mr. Fleming surmised that if NCF did not pay the suppliers on the WIP, liens would be placed on the former QMW jobs that were now being run by JWF for NCF. Because Mr. Fleming had already paid some suppliers on behalf of NCF at the request of Mr. Lavender, and because he had agreed to pay others, he believed that his failure to pay those suppliers would render his word worthless. However, he feared that if he paid the suppliers out of his own pocket, he would lose more money.

Therefore, on October 23, 2001, Mr. Fleming offered to purchase the WIP from NCF. The purchase price offered by Mr.

Fleming was based on a WIP job summary prepared by Mr. Lavender at Mr. Fleming's request. Mr. Fleming asked Mr. Lavender to prepare a job summary of the WIP because Mr. Fleming had no time to perform due diligence on the WIP himself. Mr. Fleming wanted a summary of the costs, earnings, and percentages of completion on each of the jobs on the WIP. Mr. Fleming testified that he recognized that the calculations upon which the WIP job summary was based were "estimates and take-offs and projections." (Fleming Dep. 114.) Mr. Fleming testified that he believed that Mr. Lavender was "[his] contact at that point with [NCF,]" (Fleming Dep. 80), and that he got this impression from what Mr. Simpson told him, (*id.* 81).[2]

Mr. Lavender provided similar information regarding the job costs, completion percentages, and profitability of the WIP to NCF, and NCF subsequently determined that the WIP was worth approximately $300,000.00. This valuation was based primarily on the information Mr. Lavender provided NCF.

Mr. Fleming claims that negotiations regarding Mr. Fleming's purchase of the WIP involved discussions between himself and Mr. Lavender, who reported to Mr. Simpson. Eventually, Mr. Simpson, on behalf of NCF, accepted Mr. Fleming's offer to purchase the WIP, and an agreement was reached on October 23, 2001. No personal guarantee was included in the October 23 agreement, although it was

---

[2]Moreover, it appears from the record that NCF paid all or part of Mr. Lavender's expenses and legal fees incurred with respect to the activity occurring "between when John [Fleming] took over management and when [NCF] no longer required any of [Mr. Lavender's] assistance." (Lavender Dep. 155-56.)

clear that JWF would execute a promissory note for the purchase of the WIP.

     E.    The Asset Purchase Agreement.

At some point between October 17, 2001, and November 30, 2001,[3] NCF, Mr. Lavender, JWF, and Mr. Fleming entered into an Asset Purchase Agreement ("APA"), which had an effective date of October 17, 2001. The APA allowed Mr. Fleming to assume immediate control of QMW operations and employees, with the operations run by Mr. Fleming to be conducted at his sole expense. Initially, the purchase price for WIP was to be based upon a formula that divided the revenues from ongoing jobs based upon the amount of costs financed by NCF before October 17, and the total costs as determined upon Mr. Fleming's completion of the WIP.

The APA provided that the only expenses NCF would be responsible for through the effective date of the contract were payroll and utilities. These items would be payable from the proceeds of accounts receivable. Mr. Fleming warranted in the APA that he "has examined the assets being transferred hereunder and all documents related thereto and is satisfied in all respects concerning the condition, quality and usefulness of such assets as well as the profitability of any business conducted with such

_____

[3]Mr. Fleming executed the APA between October 17 and 24, 2001, but it seems the other parties thereto did not execute the agreement until perhaps as late as the date of closing – November 30, 2001.

assets." (APA § 6.4.) Finally, Mr. Fleming waived any claim to consequential and incidental damages.

    F.    Mr. Fleming's request to amend the APA.

    On October 23, 2001, Mr. Fleming proposed to modify the APA to abandon the formula used to calculate the purchase price of the WIP, and to purchase the WIP outright from NCF for $225,000.00, payable in 90 days. Mr. Fleming based his offer of $225,000.00 on the WIP job summary, and on the fact that, according to Mr. Fleming, Mr. Lavender told him that if he offered $225,000.00, NCF would accept that offer. NCF accepted this offer conditioned upon documentation to be produced at closing.

    G.    The closing.

    The closing of Mr. Fleming's loan with First Commercial, and of his purchase of the assets and WIP of QMW, took place on November 30, 2001. NCF's attorney arrived an hour and a half late to the closing, by which time Mr. Fleming's loan with First Commercial had already been closed. Upon his arrival, NCF's attorney presented Mr. Fleming with a personal guarantee for the promissory note on the WIP. This was the first time Mr. Fleming or his attorney learned of a personal guarantee. When Mr. Fleming expressed his intent to not sign the documents, NCF's attorney began preparing to leave. After conferring with his attorney, Mr. Fleming concluded that he had no choice but to sign the personal guarantee and finalize the transfer of QMW's fixed assets and the

WIP. As such, Mr. Fleming signed the closing documents for the purchase of the assets and WIP of QMW, including the aforementioned personal guarantee.

H.   Post-closing activity on the WIP.

After Mr. Fleming began completing the WIP, he discovered it was not making the profits the WIP job summary predicted it would. Moreover, he discovered that the actual percentages of completion and costs of completion were substantially different from those set forth in the job summary. Mr. Fleming therefore had a profit and loss audit conducted on the WIP by Pearce Bevill Leesburg & Moore, P.C. ("Pearce"). Pearce concluded that the WIP job summary overestimated the profits expected to be earned on the WIP by approximately $130,000.00. According to Mr. Fleming, although the WIP was unprofitable overall, the steel erection jobs in particular caused substantial losses.

On February 11, 2002, Mr. Fleming sent a letter to Mr. Simpson, stating that his failure to pay on the note was due to the fact that the information contained in the job summary had not turned out to be accurate. He claimed that he should be entitled to set-off from the amount owed to NCF amounts representing expenses incurred after the effective date of the APA and lost profits, thus leaving the amount he admitted he owed NCF at $65,820.50.

I.   Procedural history.

NCF filed the instant lawsuit against JWF and Mr. Fleming on April 22, 2002, alleging claims against them for failure to pay the amounts owed on the promissory note and the personal guarantee. On June 4, 2002, the defendants filed a counterclaim against NCF, alleging they were fraudulently induced to purchase the WIP for more than it was worth, and stating claims against NCF for fraudulent suppression and fraudulent misrepresentation. Also on June 4, 2002, the defendants impleaded Mr. Lavender, asserting claims for fraudulent suppression and fraudulent misrepresentation against him. NCF moved for summary judgment on April 16, 2003, and Mr. Lavender moved for summary judgment on May 5, 2003. Finally, Mr. Lavender moved to strike certain portions of the affidavit of Daphne Trammel on May 20, 2003.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   DISCUSSION.

A.   Motion to strike.

Mr. Lavender has moved to strike certain portions of the affidavit of Daphne Trammell, submitted by the defendants in opposition to NCF's motion for summary judgment. The court has

viewed all the evidence, including that evidence objected to by Mr. Lavender, in the light most favorable to the defendants, as the non-movants, on the motions for summary judgment, and has concluded that even if all of the defendants' evidence is admissible, summary judgment is due to be granted as to their claims. Therefore, the court need not address Mr. Lavender's arguments with respect to the admissibility of Ms. Trammell's affidavit, and the motion to strike will be denied.

     B.   Motions for summary judgment.

        1.   NCF's motion.

     NCF has moved for summary judgment on both its claims against Mr. Fleming and JWF, and Mr. Fleming's and JWF's counterclaims against it. The court will address NCF's claims and the counterclaims separately.

           a.   NCF's claims.

     NCF alleges that there is no dispute as to any material fact and that it is entitled to judgment as a matter of law on its claims on the promissory note and personal guarantee. The court is convinced that the plaintiff has established a prima facie case for recovery under the note, and through its default, the personal guarantee. Specifically, NCF has proven the note and the guarantee, the signature of Mr. Fleming on the guarantee, the amount of the principal debt, the interest due on the debt, the default, and the demand for payment. *See Williams v. Bank of Oxford*, 523 So. 2d 367,

370 (Ala. 1988). In fact, it appears that Mr. Fleming and JWF do not dispute that a prima facie case has been made; rather, they argue that the note and guarantee are nonetheless voidable because they were procured through fraud. *See Parkway Dodge, Inc. v. Yarbrough*, 779 So. 2d 1205 (Ala. 2000).

Under Alabama law, to prevail on a fraudulent inducement defense, the defendants must provide substantial evidence that the plaintiff misrepresented a material fact concerning the subject matter of the underlying transaction, and the defendants relied on the misrepresentation to their detriment in executing the note and personal guarantee. *Oakwood Mobile Homes, Inc. v. Carter*, No. 2010100, 2002 WL 31133246, at *2 (quoting *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000)). Moreover, the defendants must provide evidence from which a reasonable factfinder could conclude that the plaintiffs acted with an intent to deceive; "Alabama law does not allow one to maintain a fraudulent-inducement [defense] based on a mere opinion." *Carter*, 2002 WL 31133246, at *3.

The defendants assert that NCF made two fraudulent misrepresentations that induced them to enter into the promissory note and personal guarantee: NCF, through Mr. Lavender, told Mr. Fleming that it would continue to pay the suppliers on the WIP, which statement was a misrepresentation that induced the defendants to purchase the WIP; and NCF fraudulently induced Mr. Fleming to

Page 15 of 24

sign a personal guarantee after the contract for the purchase of the WIP was entered into. The court is of the opinion that neither of these instances give rise to an inference that Mr. Fleming and JWF were fraudulently induced to purchase the WIP or that Mr. Fleming was fraudulently induced to sign the personal guarantee.

Specifically, the defendants have not shown any misrepresentation that induced them to purchase the WIP. On the contrary, at the time the defendants entered into the agreement to purchase the WIP, they were aware that NCF's original statement that it would pay the suppliers on the WIP was not true. In order for them to have relied on a misrepresentation, they would have to have been ignorant of the falsity of the statement at the time they entered into the agreement to purchase the WIP and signed the promissory note securing that purchase. JWF's and Mr. Fleming's allegation with respect to the falsity of NCF's original promise to pay the suppliers on the WIP does not support their claim that they were fraudulently induced to purchase the WIP, given that they knew of that statement's falsity when they entered into the contract. As such, the plaintiff is entitled to summary judgment on its claim against JWF on the promissory note.

Moreover, Mr. Fleming has not pointed to any misrepresentation on which he relied in entering into the personal guarantee. Mr. Fleming argues that his signature on the personal guarantee was "procured by fraud," and he alleges that the fraud consisted of

"NCF's last minute, surprise 'amendment' in the face of a pre-existing, valid contract" for the purchase of the WIP. (Pl.'s Brief 48.) None of these allegations constitutes a misrepresentation of any fact, much less a material fact. As such, Mr. Fleming cannot establish that the personal guarantee was procured by fraud, and the plaintiff is therefore entitled to summary judgment on its claims against JWF and Mr. Fleming on the promissory note and the personal guarantee.

            b.   The counterclaims.

    JWF and Mr. Fleming have filed counterclaims against NCF for fraudulent misrepresentation and fraudulent suppression; the court will address NCF's motion for summary judgment as to each of these claims in turn.[4]

            (1)   Fraudulent misrepresentation.

    The defendants contend that NCF, in its own behalf and through its purported agent, Mr. Lavender, fraudulently misrepresented three material facts to them: (1) NCF and Mr. Lavender fraudulently misrepresented the value of the WIP; (2) NCF and Mr. Lavender fraudulently misrepresented the fact that NCF would pay the suppliers on the WIP; and (3) NCF represented to Mr. Fleming that

---

[4]For purposes of its analysis of the claims against NCF and Mr. Lavender, the court assumes, without so holding, that Mr. Lavender acted as an agent of NCF in his negotiations with Mr. Fleming over the purchase of QMW's assets and the WIP. The court makes this assumption because it concludes that even if the defendants adduced sufficient evidence from which a reasonable factfinder could conclude that Mr. Lavender was NCF's agent, the defendants have nonetheless failed to adduce evidence sufficient to withstand the motions for summary judgment on their fraudulent misrepresentation and fraudulent suppression claims.

he would not be required to personally guarantee his purchase of the WIP. The court is of the opinion that the defendants have failed to provide evidence sufficient to permit a reasonable factfinder to conclude that any of the three statements enumerated above constitute a fraudulent misrepresentation.

To establish a claim of fraudulent misrepresentation, the defendants must provide proof of (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff, and (4) that proximately results in damage. *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988). The defendants allege that the WIP job summary constituted a fraudulent misrepresentation of the value of the WIP. However, Mr. Fleming admits that the information contained in the job summary constituted a mere estimate of the value of the WIP. In addition, Mr. Fleming warranted in the APA that he had examined the assets and all documents related to the assets and was satisfied with the "...condition, quality and usefulness of such assets as well as the profitability of any business conducted with such assets." (APA § 6.4.) Considering the fact that the WIP job summary was based on estimates, take-offs, and projections, all of which were equally available to Mr. Fleming, he can not establish that he was reasonable when he relied on the WIP job summary.[5] *See Harrington*

---

[5]The reasonableness of Mr. Fleming's reliance is further called into question by the fact that, at the time he offered to purchase the WIP and was therefore interested in the value thereof, he and JWF were in control of the assets of the company, and were working the WIP. Therefore, it appears to the court that he had

*v. Johnson-Rast & Hays Co., Inc.*, 577 So. 2d 437, 439 (Ala. 1991).

Additionally, Mr. Fleming claims that NCF fraudulently represented to him that he would not be required to personally guarantee his purchase of the WIP. However, Mr. Fleming has not pointed to any specific instance or document in which NCF represented that there would be no personal guarantee on the loan for the purchase of the WIP. Without evidence of an actual representation claimed to be false, Mr. Fleming cannot succeed on a misrepresentation claim.

In addition to the elements of fraud listed above, the defendants must prove one further element to establish that a promise to act in the future constitutes fraud. For a promise to constitute a false representation, "there must have been an intent not to do the act promised, and such a promise must have been given with the intent to deceive." *Valley Props., Inc. v. Strahan*, 565 So. 2d 571, 576 (Ala. 1990). The defendants allege that NCF promised to pay the suppliers on the WIP; however, the defendants have presented no evidence to suggest that at the time this promise was made, NCF intended to not pay the suppliers, or that the promise was made with the intent to deceive. The defendants simply aver, rather conclusorily, that "NCF knew, during the time it was engaged in negotiations to have [Mr.] Fleming purchase the fixed

_____

sufficient access to the information necessary to enable him to ascertain the validity of any estimates of the WIP's value at that time.

Page 19 of 24

assets of QMW, that it would not pay its suppliers." (Dft.'s Brief 52.) The defendants do not offer, however, any evidence to support their allegation that NCF knew, at the time it made the promise to pay the suppliers on the WIP, that it would not fulfill its promise. As such, this promise cannot serve as the basis for a fraudulent misrepresentation claim.

Because the court has found that no reasonable factfinder could conclude, based on the evidence of record, that NCF made any fraudulent misrepresentations to the defendants, on which they reasonably relied to their detriment, NCF is entitled to summary judgment in its favor on the fraudulent misrepresentation counterclaim.

(2)   Fraudulent suppression.

The defendants allege in their fraudulent suppression counterclaim that NCF had a duty to disclose the true value of the WIP to Mr. Fleming, and its failure to do so amounts to fraud. To prove a claim of fraudulent suppression, the defendants must demonstrate that (1) the plaintiff had a duty to disclose a material fact, (2) the plaintiff concealed or failed to disclose this material fact, (3) the plaintiff's concealment or failure to disclose this material fact induced the defendants to act or to refrain from acting, and (4) the defendants suffered actual damage as a proximate result of being induced to act or to refrain from acting. *ITT Specialty Risk Servs., Inc. v. Barr*, 842 So. 2d 638,

646 (Ala. 2002). The court is of the opinion that the defendants have failed to adduce sufficient evidence from which a reasonable factfinder could conclude that NCF had a duty to disclose the value of the WIP to them.

"[A] duty to disclose a material fact arises when there is a confidential relationship between the parties or when the particular circumstances of the case require such a disclosure." *Barr*, 842 So. 2d at 647. To determine whether a duty arises under particular circumstances, the court must evaluate several factors, including the relationship of the parties, the relative knowledge of the parties, the value of the particular fact, the defendants' opportunity to ascertain the fact, the customs of the trade, and other relevant circumstances. *Id.*

The defendants have proffered no justification for a finding that NCF owed them a duty to disclose.[6]  The general rule with respect to commercial parties dealing at arm's length with one another is that no duty to disclose arises. *See Glass*, 990 F. Supp. at 1349; *Trio Broad. Inc. v. Ward*, 495 So. 2d 621 (Ala. 1986). Moreover, "superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information." *Glass*, 990 F. Supp. at 1349. The fact that NCF may have had superior knowledge of the value of the WIP cannot establish a duty

---

[6]In fact, the defendants' brief does not make any arguments as to any possible basis for finding a duty to disclose.

to disclose the so-called true value of the WIP, given the arm's length nature of the transaction between NCF and the defendants.[7] Having failed to establish that NCF had a duty to disclose the value of the WIP, the defendants cannot prevail on their fraudulent suppression counterclaim.[8] As such, NCF's motion for summary judgment is due to be granted in all respects.

2.   Mr. Lavender's motion.

Mr. Lavender has moved for summary judgment as to the defendants' claims against him. JWF and Mr. Fleming have alleged claims for fraudulent misrepresentation and fraudulent suppression against Mr. Lavender; the court will address each claim in turn.

a.   Fraudulent misrepresentation.

The defendants allege that Mr. Lavender fraudulently misrepresented the fact that NCF intended to pay the suppliers on the WIP, and that he fraudulently misrepresented the value of the WIP. However, as explained above, there is no evidence to suggest that Mr. Lavender knew at the time he made the representation with respect to the suppliers on the WIP that NCF in fact intended *not* to pay the suppliers. Further, there is no evidence that he made

---

[7]Additionally, the court notes that, as stated *supra*, at note 5, at the time Mr. Fleming sought to determine the value of the WIP, he was running the WIP and had access to all information necessary to value the WIP.

[8]Even if a duty to disclose arose when the defendants asked Mr. Lavender to prepare the job summary, assuming Mr. Lavender was NCF's agent, *see supra* note 4, there is no evidence to suggest that NCF or Mr. Lavender knew that the estimates provided in the job summary were in any way inaccurate. Thus, if a duty arose, the job summary, and its estimates as to the value of the WIP, would have discharged that duty.

this misrepresentation with the intent to deceive the defendants. *See Strahan*, 565 So. 2d at 576. Moreover, as explained above, any reliance by Mr. Fleming on the estimates contained in the job summary was not reasonable as a matter of law.  Therefore, the defendants' fraudulent misrepresentation claim against Mr. Lavender fails as a matter of law, and summary judgment is due to be granted as to this claim.

b.    Fraudulent suppression.

The defendants allege that Mr. Lavender suppressed the true value of the WIP in the job summary, and that this amounts to fraudulent suppression. However, assuming that Mr. Lavender had a duty to disclose the true value of the WIP to Mr. Fleming based on Mr. Fleming's request that he prepare the job summary, there is no evidence to suggest that Mr. Lavender knew the true value of the WIP, but suppressed that information and instead represented that the WIP was worth more than its true value. In fact, the evidence indicates that Mr. Lavender "had no reason to doubt [the estimates] at the time [the job summary] was prepared." (Lavender Dep. 166.) Moreover, Mr. Fleming admitted that the estimates were just that – estimates. As such, the defendants have not produced sufficient evidence from which a reasonable factfinder could conclude that Mr. Lavender fraudulently suppressed a material fact that he had a duty to disclose. Summary judgment is therefore due to be granted as to this claim.

V.    CONCLUSION.

In sum, the motion to strike will be denied. The motions for summary judgment will be granted in all respects, and the court will enter a judgment in favor of the plaintiff on its claims against the defendants. The defendants' counterclaims and third-party claims are due to be, and will be, dismissed. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _____ of  July, 2003.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\CLERK2\Danielle\Memoranda\DIVERSITY CASES\National Canada v. JWF,
CV-02-CO-1000-S, summary judgment opinion promissory note1.wpd